[Doc. No. 16]

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY
CAMDEN VICINAGE

| | |
|---|---|
| UNITED STATES OF AMERICA <br><br> v. <br><br> ALEXANDER VARGAS | Mag. No. 13-2044 (JS) |

**MEMORANDUM OPINION AND ORDER**[1]

This matter is before the Court on defendant's "Motion to Reconsider Order of Detention and Impose Conditions of Release" [Doc. No. 16]. Pursuant to L.R.Crim.P. 46.1(b)(2), bail fixed by a Magistrate Judge may not be reviewed unless an application to modify has first been made to the Magistrate Judge who fixed bail. The Court received the government's opposition to defendant's motion [Doc. No. 20], defendant's reply [Doc. No. 21], and exercises its discretion not to hold oral argument. See L.R.Crim.

---

[1] Defendant asks the Court for the opportunity "to present live testimony during the course of a full hearing" to address certain assertions made by the government. Reply Declaration of Counsel ("Decl.") ¶7. Whether to accept an evidence proffer or to require live testimony is a matter left to the Court's discretion. United States v. Delker, 757 F.2d 1390, 1395 (3rd Cir. 1985). The Court elects not to require live testimony. As will be discussed herein, much of the new evidence defendant submitted buttresses the Court's holding that bail should be denied. Further, even if the Court accepts at face value the fact averments in defendant's Declaration, this would not change the Court's decision. This is true because, as discussed herein, defendant completely sidesteps the Court's paramount concern.

P. 1.1, incorporating L. R. Civ. P. 78.1. Defendant asks the Court to reconsider its May 21, 2013 Order [Doc. No. 13] denying his bail application. For the reasons to be discussed, defendant's motion is DENIED.[2]

Background

On May 15, 2013, the Court signed a criminal complaint charging defendant with violating 18 U.S.C. §641. Defendant is charged with knowingly embezzling, stealing and/ or converting to his own use millions of dollars in Supplemental Nutrition Assistance Program ("SNAP") benefits (a/k/a food stamp benefits) between February 15, 2012 to December 7, 2012. The establishment at issue is a small grocery store formerly named Eddie's Grocery in Camden, New Jersey. Defendant was arrested on May 16, 2013, and his initial appearance was held the same day. At or about the same time defendant was arrested, the government executed search warrants at defendant's home and Eddie's Grocery. Defendant's bail hearing was held on May 21, 2013.

On November 11, 2007, Eddie's Grocery was approved to participate in the SNAP program. N.E. filed the application and stated that he anticipated earning receipts of approximately $280,000 per year or $23,333 per month. Id. ¶9. In order to make purchases using SNAP benefits every food stamp recipient receives

---

[2]The Court's Oral Opinion denying bail is located at pages 29:10 to 35:6 of the May 21, 2013 transcript ("Tr"). [Doc. No. 14].

2

an Electronic Benefits Transfer ("EBT") Card, similar to a debit card. Every retailer authorized to accept SNAP benefits has an EBT terminal. After a customer's debit charge is authorized and charged, the retailer's bank account is credited by wire transfer. Complaint ¶6.

The complaint generally alleges that Eddie's Grocery illegally exchanged cash for SNAP benefits.[3] The complaint alleges that the charge is supported by the work of an unidentified cooperating witness and an undercover law enforcement officer. Id. ¶12. The complaint also alleges that between February 2012 to November 2012, the store redeemed $3,102,998.34 in benefits even though it was only expected to redeem $233,330. Id. ¶18. During this time the deposits to Sovereign Bank for the benefit of Eddie's were made by wire transfers. Id. ¶19. Total cash withdrawals from the grocery store account in 2012 were approximately $3.1 million. Id. ¶20.a.

The complaint alleges that on February 15, 2012, defendant was added to the Sovereign Bank account into which Eddie's SNAP benefits were deposited. N.E. was listed as the owner of the store and defendant was listed as the manager. Id. ¶11. N.E. and defendant were the only two people authorized to access the Eddie's Grocery account. Id. From February 15, 2012 to December 2012, when defendant was an authorized signator on the account, approximately $2,548,510 in cash withdrawals were made. Id. ¶20.a.

---

[3]In the transactions described in the complaint the store paid approximately $.50 for each dollar of benefits redeemed.

From February 15, 2012 to December 7, 2012, 40 withdrawals were made in defendant's name, totaling $1,869,266. Id. ¶20.b. Thirty-eight of the withdrawals were in cash using withdrawal slips, each of which bore the signature "Alex Vargas." Id. The government produced photographs from the Bank's cameras purporting to show defendant making the withdrawals. Tr. 14:16 to 15:2; Exhibit 10A. Defendant does not dispute he is identified in the photographs. According to the complaint, "the large volume of food stamp benefits cashed at Eddie's Grocery is indicative of large scale food stamp fraud, particularly given the relatively small size of the grocery store and the fact that the store had only one cash register." Complaint ¶17. Defendant alleges he was a "mere employee" at Eddie's Grocery and it was his "employer who masterminded the[] transactions using the Federal benefits program." Decl. ¶10. Defendant alleges he "did only what his employer instructed, and any deposits or withdrawals he made were without the requisite knowledge of what his employer was engaged in." Id.

On December 7, 2012, defendant opened a new business account at Sovereign Bank in the name of Andres Grocery Store. As the owner of the account, defendant transferred $150,000 from the Eddie's Grocery account into his new account. ¶20.b.[4] Between

---

[4] N.E. died on November 26, 2012. Tr. 19:1-5. The former Eddie's Grocery Store is now known as Andres Grocery Store. Tr. 16:11-15, 20:8-12; Complaint ¶10 n. 1. Andres was approved to participate in the SNAP program on April 23, 2013. Id.; Decl. ¶5.

4

December 11, 2012 to April 19, 2013, defendant withdrew $103,000 from the new account. (Exhibit 9A). Another $8,000 was withdrawn on May 14, 2013. (Exhibit 6). The withdrawal slips were signed by defendant. (Exhibit 10A).

Defendant was born in the Dominican Republic ("D.R.") but is a United States citizen. Defendant has lived in the United States for 22 years. Tr. 25:14-17. The complaint alleges defendant traveled to the D.R. approximately ten times the past two years. Complaint ¶23. At defendant's bail hearing the government produced evidence that defendant purchased eleven (11) plane tickets to the D.R. with departure dates running from October 9, 2011 to February 7, 2013. (Exhibit 5). Defendant acknowledges he supports six children and one of his children goes to boarding school in the D.R. The government produced evidence that defendant has a D.R. identification card and a debit card from what appears to be a bank in the D.R. (Exhibit 7). Based on photographs obtained from defendant's son's public Facebook account, the government suspects defendant's fifteen year old son resides in a large house in the D.R. where at least one luxury vehicle was parked. Although the D.R. house is not owned in defendants' name, the government proffers that witnesses told it that "it was Mr. Vargas' house." Tr. 6:14-17.[5] Further, according to the government, defendant

---

[5] The witnesses included defendant's mother and mother-in-law. Tr. 6:18:21. The witnesses also included defendant's wife and former employee. June 13, 2013 Letter Brief ("LB") at 2.

5

admitted to owning a house in the D.R. when he was processed after his arrest. Tr. 7:1-5.[6] It is not disputed defendant has relatives, friends and contacts in the D.R.

After defendant was arrested he was found to possess large amounts of cash. The government found $2,000 on his person when they arrested him, $2,140 in his home, and $6,400 in a lock box that contained his passport. Tr. 20:13-23. In addition, the government found in the basement of Eddie's Grocery eleven (11) uncashed payroll checks made payable to defendant, each in the amount of $247. Tr. 21:14-22; LB at 3. This leads the government to believe defendant has access to proceeds other than his relatively small salary at the grocery store.[7] The government is currently investigating whether to bring other charges against defendant including tax fraud, wire fraud, and money laundering charges. Tr. 22:14 to 23:12. The government adds that New Jersey law enforcement officials are also investigating defendant's bank records. LB at 3 n.3.

In defendant's reply to the government's opposition to his motion, defendant produced the "Reply Declaration of Counsel," with supporting documents. Defendant avers that its evidence demonstrates:

---

[6]Defendant proffers that the house was owned by his uncle. Tr. 24:19-20.

[7]The 2012 tax return for defendant and his wife reported $19,341 in income. Defendant only reported $4,698 in wages, none from Eddie's Grocery. Tr. 22:19-25 to 23:1.

6

1.  The vehicle shown in Exhibit 1 was financed by defendant. Defendant is making monthly payments. Decl. ¶4.

2.  The house and property shown in Exhibit 1 is not owned by defendant. The house was owned by defendant's deceased uncle, N.E. Id. ¶5.

3.  Defendant borrowed $60,000 from a family member to pay N.E.'s $60,000 hospital bill. Id. ¶8.

4.  Several of defendant's trips to the D.R. "were all around and contemporaneous in time with N.E.'s hospitalization, death and funeral." Id. ¶9. Defendant "paid for special fare tickets for his family members to attend [N.E.'s] funeral--there were no 'suspicious' trips to the Dominican Republic...." Id. ¶9.

5.  Defendant is paying $300 per month for his son to attend boarding school in the D.R. Id. ¶11.

6.  Defendant's "other son [age unknown] who is young and seriously misses his father, has now started having night terrors and other psychological problems as a result of his father's absence. He is throwing himself on the floor, having severe emotional issues, and he is having a terrible time...without his father." Id. ¶12.

At his bail hearing defendant proposed the following bail package: (1) surrender of his passport; (2) his mother would post available equity in two Camden properties;[8] (3) unsecured bond; (4) electronic monitoring; (5) reporting to pretrial services as necessary; and (6) defendant's mother would act as his third-party custodian. The Court denied defendant's bail application on the ground that he was a risk of flight, noting: (1) defendant had close ties to the D.R.; (2) defendant had potential access to

---

[8] The Court understands that the available equity in one home is $70,000 and $90,000 in the second home.

7

enormous sums of unaccounted for cash which would give him the means and wherewithal to abscond; (3) defendant is a frequent traveler to the D.R.; (4) the evidence of guilt is strong; (5) defendant is sophisticated in handling large sums of cash; (6) the security to be posted is relatively nominal; (7) electronic monitoring does not prevent defendant from fleeing; and (8) defendant's mother is not an adequate third-party custodian.

Discussion

Defendant's motion for reconsideration is governed by L. Crim. R. 1.1 which provides that L. Civ. R. 7.1(i) "is applicable to criminal cases tried in the District of New Jersey." See generally U.S. v. Abdullahu, Mag. No. 07-2050 (JS), 2007 WL 181610 (D.N.J. June 21, 2007); see also United States v. Curry, Crim. No. 04-280(FSH), 2006 WL 1320083, at *1 (D.N.J. May 12, 2006). A reconsideration motion may be granted only if: (1) there has been an intervening change in the controlling law; (2) evidence not previously available has become available; or (3) it is necessary to correct a clear error of law or to prevent manifest injustice. North River Ins. Co. v. CIGNA Reinsurance Co., 52 F.3d 1194, 1218 (3d Cir. 1995); Anderson v. Correctional Med. Servs., Civ. No. 04-3410(GEB), 2007 WL 1746258, at *1 (D.N.J. June 15, 2007). A motion for reconsideration is an "extremely limited procedural vehicle." Resorts Intern., Inc. v. Greate Bay Hotel and Casino, Inc., 830 F. Supp. 826, 831 (D.N.J. 1992). Indeed, reconsideration is "an extraordinary remedy" and is granted "sparingly." NL Industries,

8

Inc. v. Commercial Union Ins. Co., 935 F. Supp. 513, 516 (D.N.J. 1996). The operative term in Rule 7.1(i) is "overlooked." Resorts Intern., Inc., 830 F. Supp. at 831. The purpose of a motion for reconsideration is to correct errors of law or to present "newly discovered evidence." Harsco Corp. v. Zlotnicki, 779 F.2d 906, 909 (3rd Cir. 1985). A reconsideration motion is improper when it is used "to ask the Court to rethink what it had already thought through--rightly or wrongly." Ciba-Geigy Corp. v Alza Corp., Civ. No. 91-5286, 1993 WL 90412, at *1 (D.N.J. March 25, 1993)(citation omitted).

Defendant's motion is denied for the reason that he does not satisfy any of the criteria in Rule 7.1(i). Defendant cited no change in the applicable controlling law. In addition, instead of helping defendant, the new material defendant submitted supports the Court's decision that bail should be denied.[9] Further, the Court did not commit a clear error of law, nor is reconsideration necessary to prevent manifest injustice.

Under applicable law a defendant must be released on bail on the least restrictive condition or combination of conditions that will reasonably assure the defendant's appearance and the safety of the community. See 18 U.S.C. §3142(c)(1)(B). Pursuant to 18 U.S.C. §3142(e), however, if after a detention hearing a court determines that "no condition or combination of conditions will

---

[9] Defendant also proposes the same release conditions the Court previously found to be inadequate.

9

reasonably assure the appearance of the person as required and the safety of any other person and the community," the court must Order the detention of the person before trial.  If the government or court believes detention is appropriate because there is a risk of flight, this must be proved by a preponderance of the evidence. United States v. Himler, 797 F.2d 156, 161 (3d Cir. 1986).  The preponderance of the evidence standard requires the trier of fact to believe that the existence of a fact is more probable than its nonexistence.  U.S. v. Abdullahu, 488 F.Supp.2d 423, 438 (D.N.J. 2007)(citation omitted).[10]

The factors a court must consider in determining whether there are conditions of release that will reasonably assure the defendant's appearance as required are set forth in 18 U.S.C. §3142(g).  They include the nature and circumstances of the offense charged, including whether the offense is a crime of violence or a federal crime of terrorism, the weight of the evidence against the defendant, the history and characteristics of the defendant, and the nature and seriousness of the danger to any person or the community that would be posed if the defendant is released. Factors courts typically look at to assess a defendant's risk of flight include the nature and circumstances of the offense, the defendant's family ties, employment status and financial resources,

---

[10]Defendant's references to the government's "heavy burden" and failure to produce "convincing proof" (Brief at 9, 10) is, therefore, not an accurate statement of the government's burden of proof.  In any event, this Order leaves no doubt the Court is convinced defendant is a substantial flight risk.

10

the defendant's character and mental condition, the length of defendant's residence in the community, any prior criminal record, and any flight or failures to appear in court proceedings. United States v. Bissell, 954 F.Supp. 903, 907 (D.N.J. 1997); United States v. Giampa, 904 F.Supp. 235, 358 (D.N.J. 1995). Other factors to examine are the use of aliases, unstable residential ties, efforts to avoid arrest and hidden assets. United States v. Giordano, 370 F.Supp.2d 1256, 1264 (S.D. Fl. 2005).

For the same reasons expressed in the Court's May 21, 2013 Oral Opinion, the Court finds the government satisfied its burden of proof. In support of his release defendant emphasizes his lack of a significant criminal history, his family ties, his employment, and his ties to the community. However, as this Court has already noted, these factors do not outweigh defendant's significant ties to the D.R., his potential access to enormous sums of unaccounted for cash, and his apparent sophistication in handling large sums of money. It is or should be apparent that the Court is most concerned about defendant's potential access to enormous sums of unaccounted for cash that would give him and his family the resources, means, wherewithal and incentive to abscond. Notably, however, defendant completely sidesteps this issue. Defendant has never addressed the Court's paramount concern regarding his potential access to a substantial sum of unaccounted for cash. Defendant does not deny that in 2012 he withdrew $1.8 million from Sovereign Bank. The government does not know where the money is

and defendant has not explained what happened to the money. Defendant also does not explain how, on his small reported income, he can support his large family, buy numerous plane tickets to the D.R., arrange for his son to go to boarding school in the D.R., finance an S.U.V. vehicle, borrow $60,000 to pay N.E.'s medical bills, and carry large sums of cash. If defendant has access to even a relatively small percentage of the $1.8 million he withdrew, it would far exceed the equity in the homes he proposes to post as security. The sum involved in defendant's alleged fraudulent scheme, and the sum personally withdrawn by defendant from Sovereign Bank, dwarfs the equity defendant proposes to post. The Court is not confident the equity in the two homes proposed as security would dissuade someone who has access to substantial assets from absconding. Defendant may also have the means to relocate his family to the D.R. if he is released. As evidenced by the financial transactions listed in defendant's Declaration, defendant has access to large sums of money whose whereabouts are presently unknown. This is evidenced by defendant's car and boarding school payments, his ability to buy numerous plane tickets to the D.R., and his acknowledgment that he has to pay back the $60,000 he borrowed[11]. The same unaccounted for assets that

---

[11] The Court does not accept defendant's proffer that the D.R. plane tickets were purchased to attend N.E.'s funeral. The plane tickets (Exhibit 5) are not contemporaneous with N.E.'s death on November 26, 2012, and subsequent funeral. The listed departure dates for the tickets are October 9 (3), October 17 and November 17, 2011, February 16 and May 16 (2), 2012, and January 12 (2) and February 7, 2013. Id.

12

defendant uses to pay his significant expenses can be used to fund his flight to the D.R. or another location.

Defendant argues electronic monitoring would secure his appearance. However, as this Court stated in another case, electronic monitoring, and/or home confinement, merely impedes but does not prevent flight. U.S. v. Abdullahu, 488 F. Supp. 2d at 444. Also, the confiscation of defendant's passport does not guarantee his presence and prevent his flight to another country. United States v. Villegas, No. 3:11-cr-28, 2011 WL 1135018, at *7 (E.D. Tenn. March 25, 2011); United States v. Alavarez, No. 87 Cr. 811 (SWK), 1987 WL 27696, at *3 (S.D.N.Y. Dec. 10, 1987)(affirming Magistrate Judge's Order of detention and noting, "[s]imply relinquishing [defendant's] passports will not reasonably assure that the defendant and his family will not flee. [Defendant] has significant business and family contacts outside the United States and could easily re-establish himself elsewhere."); United States v. Diaz, No. 98 Cr. 1434 (CSH), 1998 WL 915896, at *2 (S.D.N.Y. Dec. 30, 1998)(the surrender of a passport as a condition of bail "does not furnish a guarantee against travel on false or unauthorized documents").

Defendant's ties to his community are not determinative. The ties to the community that are most significant are the "sort of family ties from which [a court] ... can infer that a defendant is so deeply committed and personally attached that he cannot be driven from it by the threat of a long prison sentence." U.S. v.

13

Reuben, 974 F.2d 580, 586 (5th Cir. 1992). "The family ties must be the type of relationship that exert a level of control that would prevent the defendant from fleeing." U.S. v. Almasri, No. H-07-155, 2007 WL 2964780, at *2 (S.D. Tex. Oct. 10, 2007)(denying bail to a health care defendant who had no significant criminal history and who had family in this country, but who had extensive contacts in Lebanon and was facing a potential maximum sentence of ten years). Although defendant is a United States citizen and has lived in this county for 22 years, he still has substantial ties to the D.R.. The Court does not believe defendant's contacts with Camden are sufficient to deter him from absconding. In addition, Congress has cautioned against relying too much on family and community ties. Abdullahu, 488 F. Supp. 2d at 442 (citation omitted)(the mere presence of defendant's immediate family in New Jersey is not sufficient to assure his presence at trial). Defendant's community ties to Camden are undermined by the fact that defendant has relatives and resources outside this country which would give him a place to reside. Id.

Defendant argues that since he is not facing a long prison sentence his incentive to flee is minimized. The Court does not accept the notion that a potential 4-6 year prison sentence does not create an incentive to flee, especially for someone who has substantial contacts overseas, and who may face new charges. In addition, given her close relationship to defendant, the Court declines to accept defendant's mother as an adequate third-party

custodian. United States v. Vega Sosa, Crim. No. 10-355 (DRD), 2011 WL 693606, at *4 n.5 (D.N.J. Feb. 24, 2011)(rejecting wife); United States v. Cachucha, 778 F. Supp. 2d 1172, 1179 (D.N.M. April 18, 2011)(rejecting fiancee). Also, although the Court regrets that defendant's young son may understandably miss his father, this does not obviate defendant's substantial risk of flight and incentive to flee.[12]

Although no two cases in the bail context are the same, an instructive case is United States v. Ruiz-Corral, 338 F. Supp. 2d 1195 (D. Colo. 2004). In that case the defendant was indicted for possessing methamphetamine and possession of a firearm during a drug trafficking crime. After the Magistrate Judge granted the defendant bail, the government appealed. On appeal the District Judge reversed and detained the defendant. In Ruiz-Corral, the defendant was a U.S. citizen but still had relatives who lived in Mexico. The defendant was also described as a "dutiful employee" who held a job for five years. Various neighbors testified about the defendant's "ties" to the community and his "good neighborliness." Defendant also had no record of previous felony convictions. In addition, the defendant agreed to post his home as security for the bond to secure his appearance. Id. at 1198-99. Despite this evidence, the court held that the defendant was a risk of flight and ordered him detained. See also United States v.

---

[12] The Court has not been provided with information to indicate whether defendant's young son acted in a similar fashion when defendant took his trips to the D.R..

Caniglia, No. CR 02-188-01, 2002 WL 32351181, at *3-4 (E.D. Pa. April 9, 2002)(ruling that defendant should be detained even though he presented 38 witnesses who attested to their belief that defendant would appear for trial and would not be a danger to the community); United States v. Corzo, 887 F.Supp. 285, 287 (S.D. Fla. 1995)(defendant was a flight risk even though he was a resident alien since 1971, he did not travel outside the United States since that time, he resided in the community, and he lived with his mother and eight year old daughter); U.S. v. Stanford, 630 F.Supp.2d 751, 756-57 (S.D. Tex. 2009)(revoking Magistrate Judge's release Order on ground, inter alia, defendant had international contacts, financial resources, and was familiar with global travel).

Even if it is not explicitly stated, defendant hints that he should be released because he is not accused of a violent crime. This argument is rejected. The risk of flight alone is sufficient to justify detention, even without a showing of danger to the community. United States v. Jackson, 823 F.2d 4, 8 (2d Cir. 1987); U.S. Stanford, 630 F.Supp.2d at 754-55 (citation omitted)("For pretrial detention to be imposed on a defendant, the lack of reasonable assurance of either the defendant's appearance, or the safety of others or the community, is sufficient; both are not required."). In addition, the concept of safety or danger to the community does not only include physical harm or violent behavior. United States v. Prevenziano, 605 F.2d 85 (3d Cir. 1979); United

States v. Giampa, 904 F. Supp. 235 (D.N.J. 1995). By directing a Court to examine the "nature and circumstances" of the charge rather than just the charge itself, Congress intended for courts to examine a defendant's actions in the context of all relevant background evidence. Abdullahu, 488 F. Supp. 2d at 439-440. The background circumstances here convince the Court that detention is appropriate. Defendant personally handled enormous sums of presently unaccounted for cash, he has access to what appears to be presently unaccounted for financial resources, and he has the knowledge, sophistication, experience, and motivation to abscond overseas, even if his passport is confiscated and he is confined to his home. The Court is skeptical of defendant's argument that he was N.E.'s patsy or dupe. Defendant personally handled substantial financial transactions. Given the small size of Eddie's Grocery it is unlikely defendant believed the millions of dollars he handled and managed came from a legitimate source. Defendant's joint control over the millions of dollars deposited in Eddie's Grocery's bank account is evidenced by his $1.8 million in withdrawals, the fact that he was a co-signator on the account, and the fact that after N.E. died he transferred a substantial sum from the Eddie's Grocery bank account to his new account. Further, after N.E. died defendant continued to carry on substantial bank transactions in his own name.

None of the cases defendant relies upon are controlling or persuasive. In United States v. Carbone, 793 F.2d 559 (3d Cir.

17

1986), the Third Circuit affirmed the District Court's decision granting bail where the defendant was a first time offender, he could be steadily employed pending trial, he was confined to his parents' house at night, and defendant's friends posted $1 million in property as surety. In Carbone, however, there was no evidence, like here, that defendant had significant overseas ties and potential access to an enormous stash of unaccounted for cash. Similarly, although in United States v. Himler, 797 F.2d 156 (3d Cir. 1986), the defendant's detention order was reversed, there was no evidence of significant overseas contacts and potential access to substantial cash assets. In U.S. v. Xulam, 84 F.3d 441 (C.A.D.C. 1996), defendant only faced six months in prison and respected members of the defendant's community were willing to supervise his release. In U.S. v. Motamedi, 767 F.2d 1403 (9th Cir. 1985), the defendant was an Iranian citizen and was released on bail. However, after the fall of the Shah, all of defendant's family's property was confiscated, his family was forced to flee, and he was not free to return to the country. Id. at 1408. This situation does not exist with regard to defendant's contacts with the D.R. In addition, in none of the cited cases did the defendant propose that he be released to work at the same location where the charged crime occurred, and be permitted to engage in the same financial transactions (e.g., redemption of SNAP benefits) that gave rise to the charged crime. The Court agrees with the government that:

18

> In this case, unlike any of the cases cited by the defendant, Vargas has an established residence in a foreign country, family members – including his son – in that country, substantial access to large quantities of cash (and at least one bank account in that country), a history of travels to that country on a regular basis, no employment outside of his [alleged] fraudulent scheme, and a strong incentive to flee – given the length of the potential term of imprisonment.

LB at 4.

Conclusion

In sum, the Court reaffirms its ruling that bail should be denied because there are no conditions or combinations of conditions that will reasonably assure defendant's appearance. Defendant has substantial overseas contact, he has access to substantial unaccounted for financial resources, he appears to be sophisticated in handling large sums of cash, he may have access to enormous sums of unaccounted for cash which would give him the means and wherewithal to abscond, the evidence against him is strong, and a relatively small sum is proposed as security.

ORDER

Accordingly, for all the foregoing reasons, it is hereby ORDERED this 25th day of June, 2013 that defendant's Motion for Reconsideration is DENIED.

s/Joel Schneider
JOEL SCHNEIDER
United States Magistrate Judge

Dated: June 25, 2013